*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0125P (6th Cir.)
File Name: 04a0125p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.                    No. 02-3529

JOHN DEMJANJUK,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-01193—Paul R. Matia, Chief District Judge.

Argued: December 10, 2003

Decided and Filed: April 30, 2004

Before: COLE and CLAY, Circuit Judges; COLLIER,
District Judge.*

———————

### COUNSEL

**ARGUED:** John H. Broadley, JOHN H. BROADLEY &
ASSOCIATES, Washington, D.C., for Appellant. Jonathan

———————

* The Honorable Curtis L. Collier, United States District Judge for the
Eastern District of Tennessee, sitting by designation.

1

C. Drimmer, UNITED STATES DEPARTMENT OF
JUSTICE, OFFICE OF SPECIAL INVESTIGATIONS,
Washington, D.C., for Appellee. **ON BRIEF:** John H.
Broadley, JOHN H. BROADLEY & ASSOCIATES,
Washington, D.C., for Appellant. Jonathan C. Drimmer,
Michelle Heyer, UNITED STATES DEPARTMENT OF
JUSTICE, OFFICE OF SPECIAL INVESTIGATIONS,
Washington, D.C., Michael Anne Johnson, ASSISTANT
UNITED STATES ATTORNEY, Cleveland, Ohio, for
Appellee.

———————

### OPINION

———————

CLAY, Circuit Judge. Defendant, John Demjanjuk,
appeals from the district court's order revoking Defendant's
citizenship, due to Defendant's illegal procurement of such
citizenship, and allowing his naturalization to be set aside
pursuant to 8 U.S.C. § 1451(a). Because we find that
Plaintiff, the United States of America ("Government"),
sustained its burden of proving through clear, unequivocal
and convincing evidence that Defendant, in fact, served as a
guard at several Nazi training and concentration camps during
World War II ("WW II"), we concur with the district court
that he was not legally eligible to obtain citizenship under the
Displaced Persons Act of 1948 ("DPA"). DPA, 62 Stat.
1013. We therefore **AFFIRM** the district court's order.

### I.

#### *Procedural History*

There are six prior decisions (three by this Court) on
matters related to Defendant's citizenship:

1.) *United States v. Demjanjuk*, 518 F. Supp. 1362 (N.D.
Ohio 1981) (revoking Defendant's citizenship and

naturalization; this result was later set aside by *Demjanjuk 6*)[1];

2.) *United States v. Demjanjuk*, 680 F.2d 32 (6th Cir. 1982) (per curiam) (affirming *Demjanjuk 1*);

3.) *Demjanjuk v. Petrovsky*, 612 F. Supp. 571 (N.D. Ohio 1985) (denying habeas, thus allowing the executive branch to extradite Defendant to Israel, *id.* at 574; but this ruling was later vacated by *Demjanjuk 5*);

4.) *Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir. 1985) (affirming *Demjanjuk 3*);

5.) *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993) (reopening the case *sua sponte, id.* at 339, after Defendant was extradited to Israel and there acquitted of all crimes. This Court held that the Government perpetrated fraud in its discovery, and accordingly vacated *Demjanjuk 3*); and

6.) *United States v. Demjanjuk*, No. C77-923, 1998 U.S. Dist. LEXIS 4047 (N.D. Ohio 1998) (setting aside *Demjanjuk 1*, on the basis of the findings of prosecutorial misconduct in *Demjanjuk 5*).

Subsequently, on May 19, 1999, the Government filed a second complaint in the district court, seeking to denaturalize Defendant on the ground that he illegally procured his United States citizenship. The first claim alleged Defendant's unlawful admission into the United States, in violation of 8 U.S.C. § 1427(a)(1), and was based on his alleged persecution of civilians during WWII, in violation of the DPA, 62 Stat. 219, 227. The second claim alleged Defendant's unlawful admission into the United States, again in violation of 8 U.S.C. § 1427(a)(1), and was based on

---

[1]The six cases are referred to as "*Demjanjuk* [number of case, as presented in the list]."

Defendant's alleged membership or participation in a movement hostile to the United States, in violation of the DPA, 64 Stat. 227. The third claim charged Defendant with illegally procuring a certificate of naturalization by making willful misrepresentation to immigration officials, in violation of 8 U.S.C. § 1451(a).

Defendant filed an Omnibus Motion to Dismiss the Complaint, which was denied by the district court in a Memorandum Opinion and Order on February 17, 2000. Defendant thereafter applied for a writ of mandamus directing the district court to dismiss the denaturalization proceeding; on April 28, 2000, this Court denied that request. Defendant then filed a counterclaim, alleging that Plaintiff tortured and harassed him and his family; this was dismissed by the district court on July 10, 2000, in a Memorandum Opinion and Order.

The case was tried without a jury on the Government's claims of Defendant's illegal procurement of United States citizenship, on May 29, 2001. On February 21, 2002, the district court released Findings of Fact and Conclusions of Law, *United States v. Demjanjuk*, No. 1:99CV1193, 2002 WL 544622 (N. D. Ohio Feb. 21, 2002) ("*Demjanjuk 7.a*"), and a Supplemental Opinion, *United States v. Demjanjuk*, No. 1:99CV1193, 2002 WL 544623 (N. D. Ohio Feb. 21, 2002) ("*Demjanjuk 7.b*"). The district court entered judgment revoking Defendant's citizenship and naturalization, and ordering Defendant to surrender and deliver his Certificate of Naturalization and any passport or other documentary evidence of citizenship to the U.S. Attorney General, within ten days.

Defendant filed motions for judgment to amend findings, to alter or amend judgment, for a new trial, and for relief from judgment under Fed. R. Civ. P. 60(b); these motions were all denied by the district court in an order on March 27, 2002.

On May 10, 2002, Defendant filed a notice of appeal of the district court's orders and judgments from July 10, 2000, February 21, 2002, and March 27, 2002. On February 24, 2003, Plaintiff filed a Motion to Strike or for Leave to File Surreply, seeking to strike Defendant's Reply Brief. On February 26, 2003, this Court denied the motion for leave to file a surreply. In addition to the instant appeal, this Court will rule on the Motion to Strike Defendant's Reply Brief in the instant opinion.

### *Facts*

In *Demjanjuk* 4, 776 F.2d 571, 575, this Court set forth the factual background for the various cases involving Defendant. We therefore recite only those facts most relevant to the appeal before us. John Demjanjuk is a native of the Ukraine, a republic of the former Soviet Union. Demjanjuk was conscripted into the Soviet Army in 1940 and then captured by the Germans, during WWII, in 1942. Later that year, after short stays in several German POW camps and a probable tour at the Trawniki SS training camp in Poland, Demjanjuk became a guard at the Treblinka concentration camp in Poland. Demjanjuk was admitted to the United States in 1952 under the Displaced Persons Act of 1948 and became a naturalized United States citizen in 1958. Defendant denied that he was a Ukrainian guard at Treblinka who was known as "Ivan or Iwan Grozny," that is, "Ivan the Terrible." He has resided in the Cleveland, Ohio area since his arrival in this country.

In the current proceeding, the Government alleges that Mr. Demjanjuk persecuted civilians at Trawniki, L.G. Okswo, Majdanek, Sobibor and Flossenburg Concentration Camps, but not Treblinka, as alleged in earlier denaturalization proceedings. Defendant was identified, in previous proceedings, as well as in the current one, by the Trawniki Camp's Identification Card which contained Defendant's picture. The Trawniki Card, the Government's exhibit #3, is

a German *Dienstausweis* or Service Identity Card, identifying the holder as guard number 1393.

One of the main issues before this Court is whether Demjanjuk was Guard 1393. There are seven German-created wartime documents in evidence that Plaintiff alleges identify Defendant. Three forensic experts testified that forensic testing revealed no evidence to doubt the authenticity of the seven wartime documents – found in archives in Russia, Ukraine, Lithuania and the former West Germany – containing Demjanjuk's name and other identifying information. (J.A. at 1407, 1416, 1423, 1441, 1461, 1861, 1877.)

### II.

### *Standard of Review*

This Court reviews for clear error when the district court's evidentiary rulings pertain to the determination of Demjanjuk's identity. *Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 990 F.2d 865, 870 (6th Cir. 1993) (stating the deference to be afforded a district court's findings of fact upon the conclusion of a bench trial is clear error, whether the facts were based on oral or documentary evidence, because "factual conclusions rendered by a district court sitting without a jury are binding on appeal unless this Court is left with a definite and firm conviction that a mistake has been made," and that "[i]t is the appellant who must shoulder the burden of proving such a mistake . . . .") (citation omitted). Under the clearly erroneous standard, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," and it "is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) (citations omitted).

Additionally, because Defendant failed to object to the Trawniki service pass at trial on the ground now asserted on appeal – namely, that the card is inadmissible hearsay – this Court reviews for plain error Defendant's contention that the service pass was erroneously admitted into evidence. *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989) ("The 'plain error' rule also applies [where] a party objects to [an evidentiary determination] on specific grounds in the trial court, but on appeal the party asserts new grounds challenging [that determination]."). At trial, Defendant objected to the admissibility of the service pass on grounds that it lacked authenticity, as required by Fed. R. Evid. 902; reliability as an ancient document, as required by Fed. R. Evid. 901(b)(8); and personal knowledge by declarant, as required by Fed. R. Evid. 602. On appeal, however, Defendant now asserts a different objection: inadmissibility of the service pass under the double hearsay prohibition of Fed. R. Evid. 805. Under the plain error standard:

> before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. . . . [I]f all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.

*Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (citations and internal quotation marks omitted).

### III.

### *Basis for Denaturalization*

An individual seeking to enter the United States under the DPA first must qualify as a refugee or displaced person with the International Refugee Organization ("IRO"). *United States v. Fedorenko*, 449 U.S. 490, 496 (1981). The IRO's Constitution identified categories of people who were not

eligible for refugee or displaced person status, including, "[a]ny. . . persons who can be shown: (a) to have assisted the enemy in persecuting civil populations of countries." *Id.* at 496, n.4. Citizenship may be deemed illegally procured if, during naturalization, an applicant failed to strictly comply with a statutory prerequisite, such as lawful admittance as a permanent resident. *Id.* at 514, n.36 (citing 8 U.S.C. § 1427(a)(1)). In a denaturalization proceeding, the government must prove its case by evidence that is clear, convincing, and unequivocal, *Kungys v. United States*, 485 U.S. 759, 772 (1988), because United States citizenship is revocable when found to be illegally procured. *Fedorenko*, 449 U.S. at 506 (citing 8 U.S.C. § 1451(a)).

The district court below issued findings of fact and conclusions of law determining that the Government sustained its burden of proving that the Trawniki service pass identifying Defendant's presence at the Nazi training camp was 1) authentic within the meaning of Fed. R. Evid. 901(a), (b) (1), (3), (4), (8); 2) admissible under Fed. R. Evid. 803(16), the ancient document exception to the hearsay rule; 3) admissible under Fed. R. Evid. 803(8), the public records and reports exception to the hearsay rule; and 4) self-authenticating as a foreign public document under Fed. R. Evid. 902(3). Under such proof, Defendant's service as a guard at a Nazi training camp, and subsequent concentration camps, would make him ineligible for a visa under the DPA §§ 10 and 13, and therefore, unlawfully admitted, rendering his citizenship illegally procured and subject to revocation under 8 U.S.C. § 1451.

Defendant now asserts that the district court abused its discretion by admitting the Trawniki service pass and relying on its identifying features to determine that Defendant was present in the Trawniki Nazi training camp in Poland during WWII. Defendant asserts that the Government submitted only two documents identifying Defendant as a Nazi guard: the Trawniki pass and a 1979 KGB protocol of the interrogation of Ignat Danilchenko, a former concentration

camp guard. (J.A. at 1407-15, 2965-72.) Defendant claims that if these two pieces of evidence fail to accurately identify him, then the subsequent identifying war documents add no further identifying information. The Government argues that there are in fact seven wartime documents that identify Defendant by his surname, three of which include Defendant's birth date and place. (J.A. at 1407, 1416, 1423, 1441, 1461, 1861, 1877.) One of those three, the Trawniki service pass, also includes Defendant's photograph, nationality, father's name, facial shape, eye color, hair color, and reference to an identifiable scar on Defendant's back.

### A. *Defendant's Allegation of Inadmissible Hearsay*

As discussed above, Defendant now bases his objections to the Trawniki service pass' admissibility on hearsay, under Fed. R. Evid. 805. Because Defendant did not object on this ground at trial, this Court can only deem it inadmissible if, as a matter of plain error, the evidence's inadmissability "should have been apparent to the trial judge without objection, or [if the evidence] strike[s] at fundamental fairness, honesty, or public reputation of the trial." *Evans*, 883 F.2d at 499 (quoting *United States v. Causey*, 834 F.2d 1277, 1281 (6th Cir.1987), *cert. denied*, 486 U.S. 1034 (1988)). Based on the district court's findings of facts and having considered both parties' briefs, we find that the Trawniki service pass was not erroneously admitted by the district court.

Defendant's argument that the district court erroneously relied on the truth of the information asserted on the service pass, because it contained double hearsay, is without merit. Defendant argues that the four elements of identifying information on the service pass: name, date of birth, place of birth and nationality, are derived from out-of-court statements by the German clerk who issued the card and the allegedly "unknown" POW who was to be labeled "Guard 1393."

Federal Rule of Evidence 901(b)(8) governs the admissibility of ancient documents. The Rule states that a

document is admissible if it "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered." The question of whether evidence is suspicious, and therefore inadmissable, is within the trial court's discretion. *United States v. Kairys*, 782 F.2d 1374, 1379 (7th Cir. 1986). Although Rule 901(b)(8) requires that the document be free of suspicion, that suspicion goes not to the content of the document, but rather to whether the document is what it purports to be. *Id*. Therefore, whether the contents of the document correctly identify the defendant goes to its weight and is a matter for the trier of fact. *Id.*; *see also Kalamazoo River Study Group v. Menasha Corp*. 228 F.3d 648, 661 (6th Cir. 2000).

The district court admitted the service pass into evidence, stating that it was authenticated under Fed. R. Evid. 901(b)(8), and satisfied six additional evidentiary rules, including two hearsay exceptions. Defendant fails to demonstrate how the district court erred in recognizing the alleged violation of double hearsay under Fed. R. Evid. 805, when the service pass was already admitted under two hearsay exceptions – namely, the ancient document rule (Fed. R. Evid. 803(16)), and the public record exception, (Fed. R. Evid. 803(8)). Hearsay within hearsay, or double hearsay, should not be excluded from admissibility if each separate hearsay component conforms to an exception to the hearsay rule. *Shell v. Parish*, 448 F.2d 528, 533 (6th Cir. 1971). This court need not analyze whether the district court would have deemed both sources of information contained in the service pass admissible under Defendant's "double hearsay" allegation, because the admission of the service pass, as identification of the Defendant, was already admitted under several other evidentiary rules, and was not so objectionable that it should have been apparent under a plain error analysis. *United States v. Price*, 329 F.3d 903, 906 (6th Cir. 2003) (citing *United States v. Rodriguez*, 882 F.2d 1059,1064 (6th Cir. 1989)).

B. *Defendant's Allegation of Unauthenticated Inadmissible Evidence*

Additionally, Defendant argues that the district court erroneously admitted the service pass as an authenticated document under Fed. R. Evid. 901(b)(8), based upon the expert testimony of Dr. Sydnor. Dr. Sydnor testified that the service card was found in the Vinnitsa Archives in the Ukraine; however, because Dr. Sydnor had never been to the Vinnitsa Archives, Defendant argues the testimony regarding the service pass' origin was not based on personal knowledge. The Government argues that Defendant's allegation of the service pass' admissibility must also be reviewed under a plain error analysis because, although Defendant objected to the admission of the service pass under Fed. R. Evid. 901(b)(8), he previously argued that the document's substantive content was unreliable and now, on appeal, argues that the Government failed to prove its origin. In the district court's findings of fact, there was uncontradicted testimony stating the origin of the service pass. *Demjanjuk 7a.*, 2002 WL 544622, at * 5. Defendant has not objected to this element of the service pass' authentication until now; therefore, this Court should use a plain error analysis in determining its admissibility. *Evans*, 883 F.2d at 499.

Again, Defendant fails to establish that the district court so obviously erred in admitting the service pass in opposition to Defendant's proof of origin objection, because the service pass was also admitted on six other evidentiary bases. Defendant is not, however, challenging the other evidentiary bases upon which the district court admitted the service pass; therefore, Defendant's objection as to its origin, even if meritorious, would be moot as there is overwhelming evidence to the contrary. *See United States v. Holloway*, 740 F.2d 1373, 1379 (6th Cir. 1984) (commenting on whether the district court erred in excluding certain evidence when there was an admission of evidence of substantially the same nature; stating "[w]e need not decide whether the district court's ruling was erroneous or whether this is a reviewable

issue because if any error occurred it was harmless" because similar evidence would have been cumulative); *see also United States v. McLernon*, 746 F.2d 1098, 1114 (6th Cir. 1984) ("We need not decide whether to adopt [a secondary issue's standard], however, because our finding that [the primary issues involved: whether the defendant] was entrapped as a matter of law into violating 21 U.S.C. § 846 and the jury's finding of not guilty on every other charge renders cummulative any error in the [inclusion of the secondary issue].") Therefore, the district court's ruling that the service pass was sufficiently authenticated by the supporting circumstantial evidence showing that the document in question is what it was purported to be was not clearly erroneous and its admissibility should stand. *See* Fed. R. Evid. 901 (b)(4). This is so particularly because Defendant did not appeal all of the additional grounds upon which the evidence was admitted.

C. *Defendant's Allegations of the District Court's Erroneous Findings of Fact*

Having deemed Defendant's hearsay argument to be without merit, this Court determines that the Government would still prevail based upon the district court's factual findings that the court's reliance on the service pass as identification evidence was not clearly erroneous. Defendant argues that because denaturalization proceedings require a much higher burden of proof, the government's case is insufficient in light of the quantum of reliable of evidence that has been required in previous cases. (Defendant's Brief at 20-21) (citing denaturalization proceedings against individuals not admitting to service for the Germans, where the government used wartime documents that contained consistent, verifiable or unchallenged identifying information pertaining to the defendants, usually supported by corroborative evidence; *see Kairys*, 782 F.2d at 1379 (7th Cir. 1986) (defendant's identification card verified defendant's thumb print and expert testimony identified the signature on the card as that of the defendant); *see also United States v.*

*Hajda*, 135 F.3d 439, 442-43 (7th Cir. 1998) (documents supported by testimony of sister and father in earlier trial stating that defendant had served in the SS)).

Here, the district court found that the Government has proven by clear, convincing, and unequivocal evidence that Defendant assisted in the persecution of civilian populations during World War II, based on evidence that the Trawniki service pass was an authentic German wartime document issued to Defendant sufficiently identifying him and establishing his presence at the Nazi training camp between 1942 and 1944. *Demjanjuk 7.a*, 2002 WL 544622.

Despite Defendant's arguments, the record before us does in fact support the district court's findings of fact, specifically regarding the Trawniki service pass. There is sufficient testimony from expert witnesses to corroborate the accuracy of the contents of the service pass, in conjunction with the additional six wartime documents that corroborate Defendant's identity. Some of the characteristics that appear on the service pass and are not disputed by Defendant, such as his name, birth date, town of birth, father's name, and nationality, also appear on other documents identifying Defendant as "Guard 1393." These additional documents also list specific characteristics of Defendant, such as his name, birth date, and place of birth. As the district court stated in its Supplemental Opinion, *Demjanjuk 7.b*, "Defendant has attacked the authenticity of the documents on various grounds, but the expert testimony of the document examiners is devastating to [D]efendant's contentions. . . . [T]he court is convinced that the Trawniki Service Identity Pass No. 1393 (GX3), for a person named Iwan Demjanjuk is authentic." *Demjanjuk 7b.*, 2002 WL 544623. Defendant tries to raise doubt as to the identity of the person on the service pass, designated as Guard 1393, but he offers no evidence to support his assertion. *See Kairys*, 782 F.2d at 1380 (holding that the trial court was not clearly erroneous in determining that there was sufficient evidence to properly identify the defendant as the Nazi guard pictured on the defendant's

alleged identification card, and although the district court primarily relied on the defendant's fingerprint on the card, there was other testimony and personal documentation that further supported the association). Given the credibility determination made with respect to the identification elements of the Government's case, this Court agrees with the Government that the district court's factual findings were not clearly erroneous.

### IV.

### *The Court's Discretion in Admitting Expert Testimony to Further Identify Defendant*

Defendant contends that the district court erred in relying on Dr. Sydnor's testimony, which served to confirm Defendant's identity, arguing that the court failed to make "a preliminary assessment of the reliability" of Dr. Sydnor's "archival search methodology" before considering his substantive testimony. The Government argues, and this Court agrees that this argument is particularly ironic, inasmuch as Defendant repeatedly relies on Dr. Sydnor's testimony to support points beneficial to his defense which require expert testimonial corroboration. (Defendant's Brief at 17, 23-25, 27 n.14). Nevertheless, Defendant argues that the court's failure to make a preliminary reliability determination of Dr. Sydnor's "archival search method" was erroneous, and in violation of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 590-93(1993) (explaining that part of a trial court's "gatekeeping" function under Fed. R. Evid. 702 when, for example, scientific opinion testimony is offered, is the determination of whether "the reasoning or methodology underlying the testimony is scientifically valid"). Defendant asserts that Dr. Sydnor's method of research was not reliably proven to be complete, and states that exculpatory evidence may not have been obtained, as was the case in Defendant's previous denaturalization proceeding. *Demjanjuk 5*, 10 F.3d 338 (6th Cir. 1993).

This Court reviews the admission or exclusion of expert evidence for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *see also United States v. Jones*, 107 F.3d 1147, 1151 (6th Cir. 1997). A "trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and [the court's] action is to be sustained unless manifestly erroneous." *Jones*, 107 F.3d at 1151 (quoting parenthetically *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S. Ct. 1119 (1962)). This discretion is particularly broad in a bench trial. *Can-Am Eng'g Co. v. Henderson Glass, Inc.*, 814 F.2d 253, 255 (6th Cir. 1987) (stating that the issue of whether a witness is qualified to testify as an expert is "left to the sound discretion of the trial judge and particularly so in a bench trial" ).

Federal Rule of Evidence 702 provides the requirements for admitting expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid 702.

In the instant action, following *voir dire*, which included a lengthy inquiry into Dr. Sydnor's methodology, the district court responded to Defendant's objection that Dr. Sydnor failed to follow an acceptable method of searching for archival documents. The court went on to commend Defendant's objection, but explained that it would permit Dr. Sydnor to testify based on his qualifications, and further explained that:

> [this] does not mean . . . the Court has to accept his testimony to any extent. Obviously, if a person who has been qualified as an expert . . . has employed techniques in a particular case that are not as valid as other techniques might have been, those factors mitigate against the acceptance of their testimony. The Court is perfectly capable of making those determinations based upon the examination and cross-examination of the witness.

(J.A. at 954-55.)

Defendant now argues that the district court prevented him from inquiring into that which *Daubert* requires: the validity and reliability of the methodology underlying the proposed testimony – in this case the methodology pertaining to performing archival searches.

*Daubert*, 509 U.S. at 594-95.

The Government relies on *Berry v. School Dist. of Benton Harbor*, 195 F. Supp. 2d 971, 977 n.3 (W.D. Mich. 2002), to assert a court's discretion as to the admissibility of evidence, when weighed by a trier of fact, and subsequently disregarded as inadmissible or unpersuasive. The Government also asserts that whether an expert correctly applied an uncontroversial methodology is a question of the evidence's weight before the trier of fact. Here, neither party contends that the methodology was original or controversial. On the contrary, Defendant states that it is the same methodology used in the previous denaturalization proceeding, which was subsequently overturned, due in part to withheld and unearthed exculpatory evidence.

This Court has previously analyzed the requirements of *Daubert*, and its preliminary reliability analysis requirement. *First Tennessee Bank National Assoc. v. Barreto*, 268 F.3d 319, 331-33 (holding that the decision to admit the defendant's expert testimony was not an abuse of discretion,

dismissing plaintiff's assertion that it was not based on "technically valid reasoning or methodology"). In *First Tennessee*, the plaintiff alleged that the lower court was in violation of *Daubert* and abused its discretion by relying on expert testimony that the defendant failed to demonstrate was supported by technically valid reasoning and methodology. 268 F.3d at 334. This Court did not agree, stating that "the fact that [the expert's] opinion may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible." *Id.*[2] The Supreme Court's decision in *Kumho* held that the trial court may utilize the four *Daubert* factors when assessing the reliability of all types of expert testimony, while reasonable measures of reliability in a particular case is a matter that the law grants

---

[2] In *First Tennessee*, this Court grappled with a then unresolved issue surrounding the interpretation of Fed.R.Evid. 702 and its *Daubert* analysis as applied to *non-scientific* expert testimony. *First Tennessee*, 268 F.3d at 333-35 (emphasis added). This Court, in *Jones*, recognized that the specific factors utilized in *Daubert* may be of limited utility in the context of non-scientific expert testimony, and if *Daubert's* framework were to be extended outside of the scientific realm, many types of relevant and reliable expert testimony–that derived substantially from practical experience–would be excluded. 107 F.3d at 1158. In *Jones,* this Court suggested that some of a forensic document examiners' duties are more practical in character, rather than scientific, but left open the question as to whether other specific duties by forensic document examiners such as the analysis of ink, ribbon, dye or the determination of water soaked documents are based on scientific knowledge. *Id*. at 1157-58, n.10. However, in *Berry v. City of Detroit*, this Court followed *Daubert's* analytical framework when assessing the reliability of proposed non-scientific expert testimony. 25 F.2d 1342, 1350 (6th Cir. 1994). Subsequently, the Supreme Court answered in *Kumho Tires Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), reaffirming *Daubert's* central holding that a trial judge's "gatekeeper" function applies to all expert testimony regardless of the category. Nevertheless, this issue is only raised for clarity as neither party has asserted that a different standard should be utilized based on a classification of the type of testimony Dr. Sydnor offers.

---

the trial judge broad latitude to determine. *Kuhmo*, 526 U.S. at 153.

Given the aforementioned analysis, the district court's colloquy with Defendant's counsel demonstrates that the trial judge was very much aware of the applicable legal standards and considered the expert's methodology in determining the weight to be attributed to the testimony. Therefore, the district court did not abuse its discretion by admitting Dr. Sydnor's testimony.

Additionally, Defendant suggests that Dr. Sydnor's research should not be relied upon for identification purposes because, he claims, it is inaccurate. Again, Defendant offers no evidentiary support, but only baseless criticism, of Dr. Sydnor's research methods and results. Defendant claims that Dr. Sydnor should have found Defendant's *Personalbogen*, a document with Guard 1393's thumb print, and should have been aware of a titled "I.M. Dem'yanyuk" file from the Ukrainian government, which became available only three weeks before trial. Nevertheless, Defendant does not challenge any of the court's specific findings regarding Defendant's wartime service based on numerous other historical documents and corroborating evidence, nor does Defendant's objections to the pieces of evidence he believed Dr. Sydnor should have found call into question the foreign archival research performed by eight other government historians in this case.

Furthermore, Defendant has not established the prejudicial effect of Dr. Sydnor's testimony, particularly because his testimony was not necessary to corroborate all of the identifying evidence. If the district court abused its discretion in admitting the evidence, then reversal is required only if the district court's ruling relied on the evidence to reach a result for which there was insufficient evidence, absent the inadmissible evidence. *United States v. Joseph*, 781 F.2d 549, 552 (6th Cir. 1986) (stating that "in a non-jury trial the introduction of incompetent evidence does not require a

reversal in the absence of an affirmative showing of prejudice. The presumption is that the improper testimonial evidence, taken under objection, was given no weight by the trial judge and the Court considered only properly admitted and relevant evidence in rendering its decision.") (citation omitted); *id.* at 553 ("'[t]he admission of such evidence is deemed harmless if there is relevant and competent evidence to establish defendant's guilt in absence of the objectionable proof.'") (citation omitted). Therefore, the district court did not abuse its discretion in admitting Dr. Sydnor's testimony into evidence, as he was properly deemed an expert witness and his testimony was not proven to be prejudicial to Defendant.

## V.

### *Willful Misrepresentation of Material Facts*

Defendant argues that his service with armies in Graza, Austria and Heuberg, Germany was involuntary, and therefore, not a basis for denial of a visa, even absent his willful misrepresentation on his visa application in violation of Section 10 of the DPA. Defendant also argues that his misrepresentations regarding his involuntary service were not material because they would not have disqualified him from being eligible to receive a visa.

This Court reviews questions of law *de novo*. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 647 (6th Cir. 2003). To the extent that the questions of law are predicated on factual findings, this Court reviews the factual findings for clear error. *United States v. Harris*, 246 F.3d 566, 570 (6th Cir. 2001). Where denaturalization would be based on an alleged misrepresentation by the citizen, there is an issue of materiality. *Kungys,* 485 U.S. at 759 (1988). Such materiality issues are also reviewed *de novo*. *United States. v. LeMaster*, 54 F.3d 1224, 1230 (6th Cir. 1995) ("materiality is a conclusion of law . . . . As such, we review a finding of materiality *de novo*.") (citation omitted).

As previously stated, the Immigration and Nationality Act provides for the denaturalization of citizens whose citizenship orders and certificates of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation. 8 U.S.C. § 1451(a); *see also United States v. Fedorenko*, 449 U.S. at 506 (citing 8 U.S.C. § 1451(a)). Citizenship is illegally procured if, during naturalization, an applicant failed to strictly comply with a statutory prerequisite, such as lawful admittance as a permanent resident. *Id.* at 514, n.36 (citing 8 U.S.C. § 1427(a)(1)). Lawful admission for permanent residence requires that the applicant enter the United States pursuant to a valid immigrant visa. *United States v. Dailide*, 316 F.3d 611, 618 (6th Cir. 2003). Therefore, entry in the United States under an invalid visa is a failure to comply with congressionally imposed statutory prerequisites to citizenship which renders any certificate of citizenship revocable as illegally procured under § 1451 (a). *Id.*

Under a Section 10 violation of the DPA, the government must establish that an applicant's willful misrepresentation was material, i.e., that it had a natural tendency to influence the relevant decision-maker's decision. *Kungys*, 485 U.S. at 771. Although the government must prove its case by evidence that is clear, convincing and unequivocal, it is not necessary for the government to prove that the defendant would not have received a visa if he had not made the misrepresentation. *Id.*

The district court correctly ruled that voluntariness is not an element of an assistance-in-persecution charge under the DPA. The Supreme Court has previously ruled that "an individual's service as a concentration camp armed guard – whether voluntary or not – made him ineligible for a visa." *Fedorenko*, 449 U.S. at 512. Additionally, a defendant need not engage in "personal acts" of persecution in order to be held ineligible for a visa, because an individual's service in a unit dedicated to exploiting and exterminating civilians on the basis of race or religion constitutes assistance in persecution

within the meaning of the DPA. *United States v. Dailide*, 227 F.3d 385, 390-91 (6th Cir. 2000).

Furthermore, the district court did not clearly err in concluding that Defendant misrepresented and concealed his wartime residence and activities, which included his service at Trawniki, Sobibor, Majdenek, with the Guard Forces of the SS and Police Leader in Lublin District, and with the SS Death's Head Battalion at Flossenburg Concentration Camp. This information was material because its disclosure would have precluded Defendant from being placed in the "of concern," category under the DPA, thus affecting the disposition of his visa application as a "displaced person." *See Fedorenko*, 449 U.S. at 514-15. If Defendant had disclosed the information regarding his service in the Austrian and German armies during his application process, the immigration officials would have naturally been influenced in their decision, because service in such armies leaves applicants ineligible under the DPA. Therefore, upon signing his Application for Immigration Visa, Defendant knowingly misrepresented material facts, leaving his entry to the United States unlawful and naturalization illegally procured.

## VI.

### *The Government's Motion to Strike Defendant's Reply Brief*

The Government moves to strike portions of Defendant's Reply brief, specifically parts IA, IB and documents in Addenda 2 and 3, because the claims asserted by Defendant were raised for the first time in the reply brief and the documents were not previously before the district court. The Government asserts that Defendant is prohibited from (1) objecting to the translation of a document not previously before the district court, which identifies Defendant as a Nazi; (2) requesting to admit the notes of Dr. Sydnor not previously before the district court; and (3) asserting a claim of perjury against one of the Government's witnesses. Defendant

unsuccessfully argues that the claims were asserted in his initial brief and the documents attached are necessary to illustrate the Government's inconsistencies and insufficient evidentiary support. The Court grants the Government's motion to strike, and finds that we cannot consider the newly raised claims or additional documents for purposes of this appeal.

As a general rule, this Court does not entertain issues raised for the first time in an appellant's reply brief. *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) (citing *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 820 F.2d 186, 189 (6th Cir. 1987)). In fact "'[c]ourt decisions have made it clear that the appellant cannot raise new issues in a reply brief; he can only respond to arguments raised for the first time in appellee's brief.'" *Id.* (quoting *United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989)).

Defendant claims that Addendum 3 to his reply brief is necessary for the Court to adequately assess Defendant's contention that the pieces of evidence pointing to his identification are without merit, and are also in violation of the Federal Rules of Appellate Procedure.[3] *See* Fed. R. App. P. 10(a) (record on appeal consists of "original papers and exhibits filed in the district court . . ."; *see also* Fed. R. App. P. 10(e) (dictating the procedure for correcting or modifying the record on appeal). Defendant's Addendum 3 contains the notes of Dr. Sydnor upon his examination of the Government's exhibit # 6, which is the transfer roster of guards from the Trawniki training camp to the Flossenburg Concentration camp, bearing Defendant's name, birth date, and birth place. Defendant sets forth no evidentiary support establishing that these notes were before the district court, nor

---

[3]Defendant originally alleged that Addendum 2 to Defendant's reply brief on appeal should also be considered by this Court; however, in Defendant's reply to the Government's Motion to Strike, he abandoned that claim, and only requests that Addendum 3 be fully considered.

is there evidence that they are even admissible documents. This Court, therefore, is under no obligation to consider the notes. *United States v. Johnson*, 584 F.2d 148, 156 n.18 (6th Cir. 1978 ) ("It is the responsibility of appellants to insure inclusion in the record of all trial materials upon which they intend to rely on appeal.").

Moreover, Defendant's substantive claims questioning the accuracy of (1) the Government's exhibit #6; and (2) the perjury allegation made upon the Government's witness Gideon Epstein, are asserted for the first time in Defendant's reply brief and are, therefore, beyond the scope of our review. *Crozier*, 259 F.3d at 517. Furthermore, Defendant cannot raise allegations in the eleventh hour, without evidentiary or legal support, as "'issues adverted to [on appeal] in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . .'" *Id*. (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)). Therefore, we will grant the Government's motion to strike the Defendant's Reply Brief.

For the reasons set forth above, we will **AFFIRM** the district court's order.